IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

ROBERT ANTHONY ANTULOV and
JULIE CLAP,

         Plaintiffs

    v.

AGC CHEMICALS AMERICAS INC.;
ALLSTAR FIRE EQUIPMENT CO.;
AMEREX CORPORATION;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BUCKEYE FIRE EQUIPMENT
COMPANY;
CARRIER GLOBAL CORPORATION;
CB GARMENT, INC. dba CREWBOSS;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHUBB FIRE, LTD;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC.;
(f/k/a DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE-DEX, LLC;
GLOBE MANUFACTURING
COMPANY LLC;
HONEYWELL SAFETY PRODUCTS
USA, INC.;
INNOTEX CORP.;
KIDDE-FENWAL, INC.;
KIDDE P.L.C., INC.;
L.N. CURTIS & SONS;

MDL No. 2873
Master Docket No. 2:18-mn-2873-RMG

CIVIL FILE NO.: _____

**COMPLAINT and
DEMAND FOR JURY TRIAL**

MALLORY SAFETY & SUPPLY LLC;
MORNING PRIDE MANUFACTURING
LLC;
MUNICIPAL EMERGENCY
SERVICES, INC.;
NARCOTE CANADA CORPORATION
(f/k/a Stedfast, Inc.);
NARCOTE HOLDING CORPORATION;
NARCOTE LLC dba STEDFAST USA,
INC.;
NATION FORD CHEMICAL
COMPANY;
NATIONAL FOAM, INC.;
PERIMETER SOLUTIONS, LP;
RICOCHET MANUFACTURING
COMPANY, INC.;
SAFETY COMPONENTS, INC., aka
SAFETY COMPONENTS FABRIC
TECHNOLOGIES, INC.;
SOUTHERN MILLS INC. dba
TENCATE PROTECTIVE FABRICS;
SPERIAN PROTECTIVE APPAREL,
LLC;
STEDFAST USA INC.;
THE CHEMOURS COMPANY;
TYCO FIRE PRODUCTS, LP, as
successor-in-interest to The Ansul
Company;
UNITED TECHNOLOGIES
CORPORATION;
UTC FIRE & SECURITY AMERICAS
CORPORATION, INC. (f/k/a GE
Interlogix, Inc.);
VERIDIAN LIMITED;
WILL-FIRE HC LLC, dba WILLIAMS
FIRE & HAZARD CONTROL;
WITMER PUBLIC SAFETY GROUP,
INC., dba THE FIRE STORE; and
W.L. GORE & ASSOCIATES, INC.,

Defendants.

Plaintiffs ROBERT ANTHONY ANTULOV and JULIE CLAP, by and through undersigned counsel, bring this Complaint against Defendants and allege, on personal information and belief, as follows:

## PRELIMINARY STATEMENT

This lawsuit concerns personal injuries arising from Mr. Antulov's exposure to toxic chemicals via aqueous film-forming foams (AFFF) and equipment soaked or coated in it. AFFF is a sprayed substance designed to extinguish what are known as Class B fires — fires fueled by flammable liquids that cannot be extinguished with water. Fluorinated surfactants create the film that cools and extinguishes these volatile fires. These per- and polyfluoroalkyl substances, generally referred to as PFAS, are strong and heat-resistant. Consequently, they are widely used in firefighting beyond AFFF; for instance, PFAS are embedded into turnout gear to make it fire resistant.

PFAS are highly persistent, in the environment and in the human body, and highly toxic, causing a stunning range of harm to human beings. Chemists have been aware of the dangers since at least the 1970s.

Yet, Defendants collectively manufactured, marketed, distributed, sold, or otherwise released into the stream of commerce AFFF and other PFAS-including products with full knowledge of its dangers. Some of them continue to do so, ignoring the availability of less toxic alternatives to PFAS.

3

Plaintiffs seek to recover compensatory and punitive damages arising out of the permanent and significant damage they have sustained as a direct result of Mr. Antulov's exposure to Defendants' AFFF and other PFAS products during his training and service as a firefighter with the Yonkers, New York, Fire Department.

## PARTIES

*Plaintiffs*

1.      Plaintiff ROBERT ANTHONY ANTULOV is a resident of Burnsville, Dakota County, Minnesota.

2.      Mr. Antulov was exposed to AFFF during his service as a firefighter with the Yonkers Fire Department in Yonkers, New York, from April 1987 to May 2018. During that time, he was exposed to AFFF and PFAS products in various ways, including through training; during live fires, most importantly during the Con Edison substation fire on October 30, 1996; and while refilling the AFFF supply on fire engines.

3.      As a result of his exposure to Defendants' fluorochemical products, Mr. Antulov was diagnosed with thyroid disease, which has caused him to suffer severe personal injuries, pain, suffering, and emotional distress.

4.      Plaintiff JULIE CLAP is a resident of Burnsville, Dakota County, Minnesota.

5.      Robert Anthony Antulov and Julie Clap were married in February 2012 and remain married to this day.

4

6.      As a result of Mr. Antulov's exposure to Defendants' PFAS products and resulting injury, Ms. Clap has suffered, and will continue to suffer, loss of consortium and loss of the society, affection, assistance, and conjugal fellowship of Mr. Antulov, all to the detriment of the marital relationship.

*Defendants*

7.      The terms "Defendant" and "Defendants" refer to all Defendants named herein, jointly and severally, unless a specific Defendant is named.

8.      References to Defendant or Defendants, or to an individual Defendant, include predecessors, successors, parents, subsidiaries, affiliates, and divisions of named Defendants.

9.      References to any acts or omissions of any Defendant or Defendants shall be taken to mean that the officers, directors, agents, employees, or representatives of the Defendant or Defendants committed or authorized such act or omission or failed to adequately supervise or properly control or direct employees engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

10.     At all relevant times, each of the Defendants manufactured, marketed, distributed, or sold fluorosurfactants, chemical predecessors to fluorochemicals, AFFF containing fluorosurfactants, or firefighting products containing or embedded with fluorosurfactants, which were used by firefighters and military service members throughout the United States, including Minnesota.

11.     Each of the Defendants manufactured, marketed, distributed, or sold fluorosurfactants, chemical predecessors to fluorochemicals, AFFF containing fluorosurfactants, or other products containing or embedded with fluorosurfactants, including firefighting gear, to which Mr. Antulov was exposed and which proximately caused Plaintiffs' injuries and damages, including personal injury, pain and suffering, emotional distress, and loss of consortium.

**Archroma Defendants**

12.     Defendant **Archroma U.S., Inc. ("Archroma")** is a Delaware corporation that does business throughout the United States, including Minnesota. Archroma has its principal place of business at 5435 Center Drive, Charlotte, North Carolina 28217.

13.     On information and belief, Archroma is a subsidiary of **Archroma Management, LLC**, a Delaware limited liability company whose principal place of business is at 5435 Center Drive, Charlotte, North Carolina 28217.

14.     Archroma Management was created when SK Capital partners acquired and renamed the chemicals divisions of **Clariant Corporation**.

15.     Defendant **Clariant Corporation**, f/k/a Sandoz Chemicals Corporation, is a New York corporation that does business throughout the United States, including Minnesota. Clariant has its principal place of business at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202.

16.     Clariant was a manufacturer of fluorotelomers, including fluorosurfactants for use in AFFF and other firefighting products.

17.     At all relevant times, Archroma and/or Clariant supplied fluorochemical products, including PFAS, to manufacturers and distributors of AFFF and other firefighting products.

**DuPont Defendants**

18.     Defendant **E. I. du Pont de Nemours and Company ("DuPont")** is a Delaware corporation that does business throughout the United States, including Minnesota. DuPont has its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

19.     On information and belief, DuPont is a successor in interest to **DuPont Chemical Solutions Enterprise ("DuPont Chemical")**, a Delaware corporation with a principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

20.     Until 2002, DuPont and DuPont Chemical manufactured, distributed, sold, or otherwise handled PFAS-containing AFFF.

21.     Defendant **The Chemours Company ("Chemours")** is a Delaware corporation that does business throughout the United States, including Minnesota. Chemours has its principal place of business 1007 Market Street, Wilmington, Delaware 19899.

22.     Defendant DuPont spun off its "Performance Chemicals" business, along with the environmental liabilities of that business, to Chemours in 2015. On information and belief, at the time of the spin-off, DuPont had been sued or threatened with suit or otherwise had knowledge that litigation regarding injuries

arising from the manufacture and sale of fluorochemicals and products containing these chemicals was likely.

23.     Defendant **The Chemours Company FC, LLC, ("Chemours FC")** is a Delaware limited liability company that does business throughout the United States, including Minnesota. Chemours has its principal place of business 1007 Market Street, Wilmington, Delaware 19899.

24.     On information and belief, Chemours FC is a successor in interest to **DuPont Chemical**.

25.     Defendant **Du Pont de Nemours Inc., f/k/a DowDuPont, Inc. ("DowDuPont")** is a Delaware corporation that does business throughout the United States, including Minnesota. DowDuPont has its principal place of business at Chestnut Road Plaza, 974 Centre Road, Wilmington, Delaware 19805.

26.     On information and belief, DowDuPont was the result of a 2017 merger between Dow Chemical and DuPont. DowDuPont was subsequently divided into three companies, one of which was **Corteva, Inc.**; in June 2019, DowDuPont changed its name to Dupont de Nemours, Inc.

27.     On information and belief, Dupont de Nemours, Inc., assumed some of DuPont's PFAS liabilities.

28.     Defendant **Corteva, Inc.**, is a Delaware corporation that conducts business throughout the United States, including Minnesota. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

29.    Corteva was created in February 2018 as a wholly owned subsidiary of DowDuPont, focused on its nutritional and agricultural businesses. DowDuPont spun Corteva off in June 2019, along with another entity, Dow, Inc. DowDuPont then changed its name to **DuPont de Nemours, Inc.**

30.    On information and belief, when it was spun off from DowDuPont, Inc., Corteva assumed some of DuPont's liabilities with regard to PFAS.

**Honeywell Defendants**

31.    Defendant **Honeywell Safety Products USA, Inc. ("Honeywell")** is a Delaware corporation that does business throughout the United States, including Minnesota. Honeywell has its principal place of business at 300 South Tryon Street Suite 500, Charlotte, North Carolina 28202.

32.    Honeywell manufactured, distributed, and sold PFAS, PFAS materials, and products containing PFAS, including firefighting gear.

33.    Defendant **Morning Pride Manufacturing LLC** is a Delaware limited liability company that does business throughout the United States, including Minnesota. Its principal place of business is at 855 S. Mint Street, Charlotte, North Carolina 28202.

34.    At all relevant times, Morning Pride Manufacturing developed, manufactured, marketed, distributed, and sold protective gear and other products for firefighters, including products containing, embedded with, or coated with PFAS.

35.    Morning Pride is a subsidiary of defendant Honeywell International.

36.     Defendant **Sperian Protective Apparel, LLC**, is a Delaware limited liability company that does business throughout the United States, including Minnesota. Its principal place of business is at 855 S Mint Street, Charlotte, North Carolina 28202.

37.     At all relevant times, Sperian manufactured, marketed, distributed, and sold personal protective equipment and other products for firefighters, including products containing, embedded with, or coated with PFAS.

38.     In 2010, Sperian was acquired by and became a subsidiary of defendant Honeywell International.

**UTC Defendants**

39.     Defendant **United Technologies Corporation ("UTC")** was a Delaware corporation that does business throughout the United States, including Minnesota. UTC has its principal place of business at 8 Farm Springs Road, Farmington, Connecticut 06032.

40.     UTC manufactured, distributed, sold, or otherwise handled PFAS-containing AFFF.

41.     In 2020, UTC merged with Raytheon Company to form **Raytheon Technologies**, now **RTX Corporation**. On information and belief, RTX Corporation is a successor in interest to UTC. RTX Corporation is a Delaware corporation that does business throughout the United States, including Minnesota. RTX's principal place of business is at 1000 Wilson Boulevard, Arlington, VA 22209.

42.     Raytheon later spun off **Otis Worldwide** and **Carrier Global**.

43.     Defendant **Carrier Fire & Security Americas Corporation, f/k/a UTC Fire & Security Americas Corporation, Inc. ("UTC Fire & Security")**, f/k/a GE Interlogix, Inc., is a Delaware corporation that does business throughout the United States, including Minnesota. UTC Fire & Security has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

44.     On information and belief UTC Fire & Security was a division of UTC.

45.     UTC Fire & Security manufactured, distributed, sold, or otherwise handled PFAS-containing AFFF.

46.     Defendant **Carrier Global Corporation ("Carrier")** is a Delaware corporation that does business throughout the United States, including Minnesota. Carrier has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

47.     At its formation in March 2020, Carrier inherited UTC's Fire & Security businesses, including the **Chubb Fire** and **Kidde-Fenwall** brands, which manufactured, distributed, and sold PFAS-containing AFFF.

48.     On information and belief, Carrier took over **UTC Fire & Security** and renamed it Carrier Fire & Security Americas.

49.     Defendant **Chubb Fire, Ltd. ("Chubb")** is a foreign private limited company that has its main offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. On information and belief, Chubb is registered in the United Kingdom with a registered number of 134210.

50.     On information and belief, Chubb is or has been composed of different subsidiaries or divisions, including but not limited to **Chubb Fire & Security Ltd.**; **Chubb Security, PLC**; **Red Hawk Fire & Security, LLC**; and **Chubb National Foam, Inc.** Chubb is part of UTC Climate, Controls & Security, a unit of UTC.

51.     Chubb and its subsidiaries and divisions manufactured, distributed, sold, or otherwise handled or used PFAS-containing AFFF.

52.     Defendant **Kidde-Fenwal, Inc.,** is a Delaware corporation that does business throughout the United States, including Minnesota. Kidde-Fenwal has its principal place of business at 400 Main Street, Ashland, Massachusetts 01721.

53.     On information and belief, Kidde-Fenwal was part of **UTC Fire & Security Americas Corporation**, later subsumed by **Carrier**, and is the successor in interest to **Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.)**.

54.     Kidde-Fenwal and its predecessors manufactured, distributed, sold, or otherwise handled PFAS-containing AFFF.

**Other Defendants**

55.     Defendant **AGC Chemicals Americas Inc. ("AGC Chemicals")** is a Delaware corporation that does business through the United States, including Minnesota. AGC Chemicals has its principal place of business at 55 E. Uwchlan Ave, Suite 201, Exton, Pennsylvania 19341.

56.     Upon information and belief, AGC Americas is a subsidiary of **AGC, Inc.**, a Japanese corporation formerly known as Asahi Glass Company, Ltd., whose principal place of business is at 1-5-1 Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

57.     AGC Chemicals manufactures glass and chemical products, including fluorochemicals used in AFFF and other firefighting products.

58.     Defendant **Allstar Fire Equipment Co. ("Allstar")** is a California corporation that does business throughout the United States, including Minnesota. Allstar has its principal place of business at 12328 Lower Azusa Road, Arcadia, California 91006.

59.     Allstar manufactured, distributed, sold, or otherwise handled PFAS, PFAS materials, and products containing, embedded with, or coated with PFAS, including products used in firefighting.

60.     Defendant **Amerex Corporation** is an Alabama corporation that does business throughout the United States, including Minnesota. Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, Alabama 35173.

61.     At all relevant times, Amerex manufactured, distributed, sold or otherwise handled AFFF and other products containing PFAS.

62.     Defendant **Arkema, Inc.**, is a Pennsylvania corporation that does business throughout the United States, including Minnesota. Arkema has its principal place of business at 900 First Avenue, King of Prussia, Pennsylvania 19406.

63.     Arkema is a manufacturer of specialty chemicals and fluoropolymers, including fluorosurfactants used in AFFF.

64.     Arkema is a successor in interest to **Elf Atochem North America** and **Atofina Chemicals Inc.**, which manufactured and sold fluorosurfactants for use in AFFF.

65.     Defendant **BASF Corporation** is a Delaware corporation doing business throughout the United States, including Minnesota. BASF Corporation has its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

66.     BASF is successor in interest to **Ciba-Geigy Corporation**, **Ciba Specialty Chemicals**, and **Ciba, Inc.**, which manufactured fluorosurfactants for use in AFFF and other firefighting products.

67.     On information and belief, BASF is the largest affiliate of **BASF SE** and the second largest chemical manufacturer in the United States.

68.     Defendant **Buckeye Fire Equipment Company ("Buckeye")** is an Ohio corporation that does business throughout the United States, including Minnesota. Buckeye has its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

69.     Buckeye began manufacturing, distributing, and selling PFAS-containing AFFF in the 2000s and, on information and belief, continues to do so to this day.

70.     Defendant **CB Garment dba CrewBoss** is an Oregon corporation that does business throughout the United States, including Minnesota. CrewBoss has its principal place of business at 830 Wilson Street, Eugene, Oregon 97402.

71.     CrewBoss develops, manufactures, and supplies PFAS and products containing PFAS in the form of turnout gear and Class B foams for firefighters and other customers.

72.     Defendant **ChemDesign Products, Inc. ("ChemDesign")**, f/k/a SpecialtyChem Acquisition Corp., is a Delaware Corporation that does business throughout the United States, including Minnesota. ChemDesign has its principal place of business at Two Stanton Street, Marinette, Wisconsin 54143.

73.     ChemDesign manufactured fluorosurfactants that were used to make AFFF and other firefighting products.

74.     Defendant **Chemguard, Inc.,** is a Wisconsin corporation that does business throughout the United States, including Minnesota. Chemguard has its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

75.     Chemguard manufactured, distributed, and sold PFAS-containing AFFF.

76.     On information and belief, Chemguard is a subsidiary of **Johnson Controls International PLC** and acquired defendant **WillFire HC LLC dba Williams Fire and Hazard Control**, which continues to sell and distribute PFAS-containing AFFF.

77.     Defendant **Chemicals, Inc.,** is a Texas corporation that does business throughout the United States, including Minnesota. Chemicals, Inc. has its principal place of business at 12321 Hatcherville Road, Baytown, Texas 77521.

78.     Chemicals, Inc., manufactured and sold fluorosurfactants for use in AFFF and other firefighting products.

79.     Defendant **Daikin America, Inc. ("Daikin")** is a Delaware corporation that does business throughout the United States, including Minnesota. Daikin's principal place of business is at 20 Olympic Drive, Orangeburg, New York 10962.

80.     At all relevant times, Daikin developed and manufactured various fluorochemical products for use in AFFF and other firefighting products.

81.     Defendant **Deepwater Chemicals, Inc. ("Deepwater")** is a Delaware corporation that does business throughout the United States, including Minnesota. Deepwater has its principal place of business at 196122 East County Road 40, Woodward, Oklahoma 73801.

82.     At all relevant times, Deepwater manufactured fluorosurfactants for use in AFFF and other firefighting products.

83.     Defendant **Dynax Corporation** is a Delaware corporation that conducts business throughout the United States, including Minnesota. Its principal place of business is 79 Westchester Avenue, Pound Ridge, New York 10576.

84. On information and belief, Dynax has been manufacturing fluorosurfactants and stabilizers used in AFFF since the early 1990s and is a leading global producer of these chemicals.

85. Defendant **Fire-Dex, LLC ("Fire-Dex")** is a Delaware corporation that does business throughout the United States, including Minnesota. Fire-Dex has its principal place of business at 780 South Progress Drive, Medina, Ohio 44256.

86. Fire-Dex manufactured, marketed, and sold PFAS, PFAS materials, and products containing PFAS, including firefighting gear.

87. Defendant **Globe Manufacturing Company LLC ("Globe")** is a New Hampshire corporation that does business throughout the United States, including Minnesota. Globe has its principal place of business at 37 Loudon Road, Pittsfield, New Hampshire 03263.

88. Globe manufactured, marketed, and sold PFAS, PFAS materials, and products containing PFAS, including firefighting gear.

89. Defendant **Innotex Corporation** is a Delaware corporation that does business throughout the United States, including Minnesota. Its principal place of business is at 2397 Harts Ferry Road, Ohatchee, Alabama 36271.

90. At all relevant times, Innotex Corporation developed, manufactured, and distributed personal protective equipment, including products containing, embedded with, or coated with PFAS, for firefighters and first responders.

91.     Defendant **Kidde P.L.C., Inc.,** is a Delaware corporation that does business throughout the United States, including Minnesota. Kidde P.L.C. has its principal place of business at One Carrier Place, Farmington, Connecticut 06034.

92.     On information and belief, Kidde PLC was formerly known as **Williams Holdings, Inc. or Williams US, Inc.**

93.     Kidde P.L.C. manufactured, distributed, sold, or otherwise handled PFAS-containing AFFF.

94.     Defendant **L.N. Curtis & Sons** is a California corporation that does business throughout the United States, including in Minnesota. Its principal place of business is at 185 Lennon Lane, Suite 110, Walnut Creek, California 94598.

95.     At all relevant times, L.N. Curtis & Sons marketed, distributed, and provided protective gear and other safety products, including products containing, embedded with, or coated with PFAS, to first responders and emergency services departments.

96.     Defendant **Mallory Safety & Supply LLC** is a California corporation that does business throughout the United States, including Minnesota. Its principal place of business is at 1040 Industrial Way, Longview, Washington 98632.

97.     At all relevant times, Mallory developed, manufactured, distributed, released, sold, or used PFAS and PFAS-containing products to be used by firefighters, first responders, and other safety professionals.

98.     Defendant **Municipal Emergency Services, Inc.**, is a Nevada corporation that does business throughout the United States, including Minnesota.

Its principal place of business is at 12 Turnberry Lane, Sandy Hook, Connecticut 06482.

99.    At all relevant times, Municipal Emergency Services marketed, distributed, and provided firefighting and emergency response equipment, including products containing, embedded with, or coated with PFAS.

100.    Defendant **Narcote LLC** is a Delaware corporation that does business throughout the United States, including Minnesota. Its principal place of business is at 800 Mountain View Drive, Piney Flats, Tennessee 37686.

101.    Narcote was created in 1955 as a division of North American Rayon for the purpose of treating fabrics with polyvinyl chloride and was spun off as a separate entity in 1996.

102.    On information and belief, Stedfast USA, Inc., and Narcote LLC began a joint venture in 2013; Stedfast relocated its production to Narcote's Tennessee facility.

103.    Defendant **Nation Ford Chemical Company ("Nation Ford")** is a South Carolina corporation that does business throughout the United States, including Minnesota. Nation Ford has its principal place of business at 2300 Banks Street, Fort Mill, South Carolina 29715.

104.    Nation Ford manufactured fluorosurfactants for use in AFFF and other products.

105.    Defendant **National Foam, Inc.,** is a Delaware corporation that does business throughout the United States, including Minnesota. National Foam has its

19

principal place of business at 141 Junny Road, Angier, North Carolina 27501, and 350 East Union Street, West Chester, Pennsylvania 19382.

106.    On information and belief, National Foam is a subsidiary of Angus International Safety Group, Ltd., that manufactures and sells Angus brand PFAS-containing AFFF products. National Foam began manufacturing, marketing, and selling AFFF in the 1970s.

107.    Defendant **Perimeter Solutions, LP**, is a Delaware limited partnership that does business throughout the United States, including Minnesota. Its principal place of business is at 8000 Maryland Avenue, Suite 350, Clayton, Missouri 63105.

108.    At all relevant times, Perimeter Solutions was a manufacturer, distributer, and provider of fire retardants, foam concentrates, and fuel gelling agents, including products containing, embedded with, or coated with PFAS.

109.    Defendant **Ricochet Manufacturing Co., Inc.**, is a Pennsylvania corporation that does business throughout the United States, including Minnesota. Its principal place of business is at 4700 Wissahickon Avenue, Suite 112, Philadelphia, Pennsylvania 19144.

110.    At all relevant times, Ricochet Manufacturing created, manufactured, sold, and distributed personal protective equipment for first responders, including products containing, embedded with, or coated with PFAS.

111.    Defendant **Safety Components, Inc., aka Safety Components Fabric Technologies, Inc. ("SCI")**, is a Delaware corporation that does business

throughout the United States, including Minnesota. Its principal place of business is at 40 Emery Street, Greenville, South Carolina 29605.

112.    At all relevant times, SCI manufactured, marketed, and distributed textiles and technical fabrics for military and firefighting applications, including products containing, embedded with, or coated with PFAS.

113.    Defendant **Southern Mills, Inc., dba TenCate Protective Fabrics** is a Georgia corporation that does business throughout the United States, including Minnesota. Its principal place of business is at 6501 Mall Boulevard, Union City, Georgia 30291.

114.    At all relevant times, Southern Mills, under its own name and as TenCate Protective Fabrics, manufactured, marketed, sold and distributed protective clothing fabrics, thermal barriers, and outer shells, including products containing, embedded with, or coated with PFAS, for use in firefighting, military, and industrial applications.

115.    Defendant **Stedfast USA, Inc.**, is a Delaware corporation that does business throughout the United States, including Minnesota. Its principal place of business is at 800 Mountain View Drive, Piney Flats, Tennessee 37686.

116.    At all relevant times, Stedfast USA manufactured, marketed, and distributed a range of protective barrier technologies, including products containing, embedded with, or coated with PFAS, to military and emergency services customers.

117.    On information and belief, Stedfast USA, Inc., and Narcote LLC began a joint venture in 2013; Stedfast relocated its production to Narcote's Tennessee facility.

118.    Defendant **Tyco Fire Products, LP ("Tyco")** is a Delaware limited partnership that does business throughout the United States, including Minnesota. Tyco has its principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

119.    On information and belief, Tyco is the successor in interest to The Ansul Company, which it acquired in 1990, and a subsidiary of Johnson Controls International PLC.

120.    Ansul began manufacturing, distributing, and selling PFAS-containing AFFF in or around 1975; Tyco continued to manufacture and sell the Ansul brand of products, including Ansul-brand AFFF-containing products, after its acquisition of Ansul.

121.    On information and belief, Tyco acquired the Chemguard brand in 2011 and continues to sell Chemguard AFFF products through its Chemguard Specialty Chemicals division.

122.    Defendant **Veridian Limited** is an Iowa corporation that does business throughout the United States, including Minnesota. Its principal place of business is at 3710 West Milwaukee Street, Spencer, Iowa 51301.

123.    At all relevant times, Veridian created, manufactured, marketed, distributed, and sold turnout gear for use in firefighting, including products containing, embedded with, or coated with PFAS.

124.    Defendant **Witmer Public Safety Group, Inc. dba The Fire Store** is a Pennsylvania corporation that does business throughout the United States, including Minnesota. Its principal place of business is at 101 Independence Way, Coatesville, Pennsylvania 19320.

125.    At all relevant times, Witmer marketed, provided, and distributed public safety equipment and supplies, including AFFF and products embedded or coated with PFAS, to fire departments and other customers.

126.    Defendant **W.L. Gore & Associates, Inc.**, is a Delaware corporation that does business throughout the United States, including Minnesota. It has its principal place of business at 555 Paper Mill Road, Newark, Delaware 19711.

127.    At all relevant times, W.L. Gore manufactured, marketed, distributed, and sold products derived from fluoropolymers, including performance fabrics and other products containing, embedded with, or coated with PFAS.

## JURISDICTION AND VENUE

128.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiffs and Defendants are from different states and the amount in controversy exceeds $75,000.

129.    This Complaint is filed in the U.S. District Court for the District of South Carolina as permitted by Case Management Order No. 3 in MDL No. 2873, issued by Judge Richard M. Gergel.

130.    But for CMO 3, Plaintiffs would have filed this Complaint in the United States District Court for the District of Minnesota. Plaintiffs designate the District of Minnesota as their home venue, as required by CMO 3.

131.    But for CMO 3, venue would be proper in the District of Minnesota under 28 U.S.C. § 1391 because Plaintiffs were residents of the District of Minnesota at the time Mr. Antulov's injury by Defendants' products became evident, a substantial part of the events or omissions giving rise to the claim occurred in the district, and Defendants conduct business within the district..

132.    Venue is proper in the District of South Carolina under CMO 3.

## FACTUAL ALLEGATIONS

*AFFF and PFAS*

133.    AFFF is a fluorinated foam product used to fight flammable liquid fires.

134.    These fluorinated foams work in two ways: by cooling the fire and by creating a film that lays over the liquid, blocking oxygen from contacting it and smothering the fire.

135.    The film is enabled by fluorinated surfactants. Specifically, the versions of AFFF in use currently and in the past rely on per- and polyfluoroalkyl substances (PFAS).

136.    As a class, PFAS are strong and heat resistant, qualities that have made them useful in a wide range of everyday applications, from nonstick cookware to water-resistant fabrics.

137.    PFAS are also used in firefighting gear, to make textiles fire-resistant and thus enhance firefighter safety.

138.    PFAS are synthetic chemicals that do not appear in nature and do not degrade over time; for this reason, they have gained the tag "forever chemicals."

139.    Defendants' own research demonstrated that PFAS was resistant to environmental degradation and would persist in the environment indefinitely, remaining toxic as it did, by the 1970s.

140.    Research has linked PFAS exposure — including through exposure to AFFF — to a long and growing list of diseases, including kidney cancer, testicular cancer, liver cancer, testicular tumors, pancreatic cancer, prostate cancer, leukemia, lymphoma, bladder cancer, thyroid disease, thyroid cancer, ulcerative colitis and other diseases of the digestive tract, and infertility.

141.    By the end of the 1960s, Defendants' own testing indicated that exposure to PFAS and PFAS-containing materials resulted in adverse health effects among laboratory animals.

142.    Further testing found that at least one PFAS caused testicular tumors in rats, leading Defendant DuPont to classify PFAS as a carcinogen in its internal records.

143.    Defendants understood, or should have understood, that without information regarding the specific mechanism of carcinogenesis, a substance known to cause cancer in animals must be presumed to cause cancer in humans.

144.    However, Defendants did not share the results of their research with customers, users, or government agencies.

145.    Nor did they share the growing body of information they accumulated in the 1980s, showing elevated incidence of cancer, liver disease, and birth defects among people exposed to PFAS and a high rate of biopersistence in human beings.

146.    Further cancer studies in the 1990s showed that PFAS caused testicular, liver, and pancreatic cancer in rats. Defendants still did not publish or report this information.

147.    Throughout this period, Defendants repeatedly assured federal, state, and local agencies that PFAS was safe, presenting little or no risk to human health.

148.    In 2000, the U.S. Environmental Protection Agency (EPA) acquired documentation of a study, jointly sponsored by Dow and 3M, that traced the effects of PFAS exposure in monkeys.

149.    The results were seriously troubling: several of the monkeys died, in some cases within three weeks of exposure, even those receiving the lowest dosage.

150. Consequently, the study could find no level of exposure that could be deemed "safe."

151. In the wake of this study, 3M began to phase out its production of PFAS products, including AFFF.

152. Even as it exited the market, 3M publicly maintained that its "products are safe" and that "the presence of these materials at very low levels does not pose a health or environmental risk." 3M indicated to the EPA that its decision was driven purely by the availability of "other business opportunities."

153. As these results became more widely known, some Defendants ceased to produce the original form of AFFF, switching to a form that used "new" PFAS, called "short-chain PFAS" because they had fewer carbon molecules. The Chemours product GenX is among these "new" PFAS substances.

154. Defendants have continued to claim that these "new" PFAS are "safe" even as studies find the substance in human blood and research shows that short-chain PFAS work in much the same way and come with the same or similar risks to human health, as old PFAS.

155. Defendants have refused to acknowledge the toxicity of PFAS even in the face of a public report by an independent science panel, the C8 Panel, that linked exposure to as little as 0.05 parts per billion of PFAS to a long list of serious diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and high cholesterol.

156.   In the face of this data, Defendants have continued to assure users, customers, and government agencies that its products are safe and argue that the work of the C8 Panel was flawed and inadequate.

157.   At all relevant times, Defendants knew or should have known that PFAS was highly toxic and dangerous.

158.   At all relevant times, Defendants were aware that AFFF users stockpiled large amounts of the product; AFFF's long shelf-life was one of its selling points.

159.   However, even as some Defendants shifted formulations or phased out production of AFFF and other products made with PFAS, they did not instruct customers not to use their stockpiled AFFF or take any action to remove the dangerous products from the market.

160.   At no time did Defendants warn government agencies, firefighters or trainees, or others who would foreseeably come into contact with their AFFF products of the dangers of their AFFF and PFAS-including products to human health.

161.   At all relevant times, Defendants possessed the resources and ability to acquire knowledge about the biological and environmental effects of PFAS and share that knowledge. However, Defendants have, individually and collectively, chosen not to fund studies or conduct research, share the information they have collected, engage in the work required to confirm or refute their claims regarding

the inadequacy of the C8 Panel's work, or otherwise take action to ascertain the extent of the danger whose existence they were well aware of.

162.    At all relevant times, Defendants controlled, minimized, manipulated, and otherwise shaped the information about PFAS, its dangers, and its presence in the human body published in peer-reviewed journals, released by government entities, and otherwise made available to the public.

163.    At all relevant times, Defendants attacked, challenged, discredited, and otherwise sought to undermine any scientific findings or other information that suggested a connection between adverse health effects and PFAS exposure.

164.    At all relevant times, Defendants willfully concealed from customers, users, government agencies, and the public information that would have alerted Mr. Antulov, or anyone else, to the dangers of exposure to PFAS.

165.    At all relevant times, Defendants encouraged the continued use of PFAS, including in AFFF and in firefighting gear, and continued to argue that "new" PFAS were not dangerous, in the face of contrary evidence regarding the toxicity and biopersistence of these substances.

166.    Defendants continue to this day to deny that the presence of PFAS in human blood presents any injury or risk of harm.

167.    Defendants continue to this day to deny the existence of scientific evidence demonstrating the significant health risks associated with exposure to PFAS.

168.   Consequently, PFAS has attracted growing attention from environmental regulators, including the EPA.

169.   The EPA has developed a PFAS Action Plan to guide regulation of the substances, released a Significant New Use Rule for PFAS (July 2020) and proposed a second one (January 2023), and, in April 2024, imposed a national drinking water standard for PFAS with which all water systems must comply within three years.

170.   However, concerns about PFAS in the environment date back to the late 1960s, when the U.S. Navy began to require all ships to carry AFFF.

171.   The Navy's own research centers worried about the impact of the substance when discharged into the sea, but repeated proposals to test the substance went undeveloped.

172.   Although some studies in the 1980s linked PFAS to environmental effects such as fish kills, very little data were developed regarding the biological effects of PFAS, in humans or animals.

*Plaintiff's Exposure*

173.   Upon information and belief, Yonkers, New York, through the Yonkers Fire Department, stored and used Defendants' AFFF containing PFOA, PFOS chemicals, or their precursor chemicals in firefighter training and firefighting calls.

174.   Defendants designed, manufactured, marketed, distributed, or sold AFFF containing PFOA or PFOS chemicals or their precursor chemicals to the Yonkers Fire Department.

175.    On information and belief, the Yonkers Fire Department purchased and provided to its firefighters turnout gear embedded or coated with PFAS or PFOA.

176.    The descriptive labels and material safety data sheets for Defendants' AFFF containing PFOA or PFOS or their precursor chemicals utilized by firefighters and other Yonkers Fire Department personnel did not reasonably or adequately describe AFFF's risks to human health.

177.    The Defendants knew or should have known of the hazards of AFFF containing PFOA or PFOS or their precursor chemicals when the products were manufactured.

178.    From April 1987 to May 2018, Mr. Antulov served as a firefighter with the Yonkers Fire Department.

179.    During that time, Mr. Antulov worked and trained with AFFF, used AFFF to fight fires, and refilled AFFF tanks on the fire engines.

180.    In the course of his duties, Mr. Antulov repeatedly came into contact with AFFF foam and residue, which soaked through his clothing and remained in contact with his skin for extended periods of time.

181.    Mr. Antulov was a responding firefighter at the Con Edison substation fire in October 1996, where large quantities of AFFF were deployed over several hours.

182.    Mr. Antulov was also a responding firefighter at an earlier Con Edison fire in the late 1980s. AFFF was also used extensively in the response to that fire.

183.   During those fires, as well as during other training events and live fire responses, Mr. Antulov was exposed through breathing aerosolized AFFF foam and through AFFF residue that remained in contact with his skin for hours.

184.   Mr. Antulov was further exposed through is turnout gear, which he wore for the duration of each fire response or training session, often for hours at a time.

185.   During  Mr. Antulov's extended contact with Defendants' AFFF containing PFOA or PFOS, the PFOA or PFOS entered his body.

186.   At no point, in training or in the course of his career, did Mr. Antulov receive any warning that Defendants' AFFF or its constituent or precursor ingredients was toxic or carcinogenic.

187.   In or around September 2019, Mr. Antulov's doctors diagnosed him with thyroid disease.

188.   In or around February 2024, Mr. Antulov discovered that his illness was caused by exposure to Defendants' AFFF and AFFF-related fluorochemical products.

189.   Mr. Antulov suffered, and continues to suffer, the physical and emotional effects of his illness proximately caused by exposure to Defendants' fluorochemical products.

190.   Ms. Clap suffered, and continues to suffer, from the loss of Mr. Antulov's society, affection, assistance, and conjugal fellowship, to the detriment of her marital relationship, and associated emotional distress.

32

## CAUSES OF ACTION

### Count I: Negligence

191.    The foregoing paragraphs are incorporated by reference.

192.    Defendants had a duty to exercise reasonable care in the design, development, engineering, manufacture, testing, production, marketing, sale, and distribution of their inherently dangerous products, including PFAS and products containing PFAS.

193.    Defendants' duty of care was commensurate with the inherently dangerous and harmful nature of PFAS, including its toxicity and biopersistence.

194.    Defendants failed to exercise ordinary care by acts or omissions that allowed Plaintiff Robert Anthony Antulov to be exposed to PFAS and its dangers and to have his blood and body contaminated with PFAS.

195.    Defendants knew or should have known or foresaw or should have foreseen that their acts or omissions in the design, engineering, marketing, sales, and distribution of their PFAS products, including AFFF and other PFAS-containing products, would likely result in the exposure of users, including Mr. Antulov, to PFAS and to the resulting risks of harm.

196.    Defendants, through their acts or omissions as described in this Complaint, breached their duty to Mr. Antulov.

197.    Defendants' negligent conduct was the direct and proximate cause of the injuries and harm to Mr. Antulov.

198.    But for Defendants' negligent acts or omissions, Mr. Antulov would not have been injured, and Ms. Clap would not have suffered the consequent loss of consortium.

199.    Consequently, Plaintiffs are entitled to compensatory damages for medical expenses, pain and suffering, lost wages, loss of consortium, and emotional distress.

### Count II: Gross Negligence

200.    The foregoing paragraphs and are incorporated by reference.

201.    In refusing to acknowledge or act on information about the inherently dangerous nature of their PFAS-containing products, Defendants acted willfully and recklessly, with disregard for the rights and safety of Mr. Antulov and others.

202.    Defendants had actual notice of the inherent dangerousness of PFAS and their PFAS-containing products, in the form of research performed or sponsored by them.

203.    By denying, minimizing, or suppressing such information, Defendants not only exposed Plaintiff and others to a high risk of serious injury; they also denied Mr. Antulov and others information they needed to protect themselves.

204.    The actions of Defendants and their employees, agents, officers, and representatives were willful and wanton and exhibited a reckless disregard for the life, health, and safety of the end users of Defendants' PFAS-containing products, including Mr. Antulov.

205.    Defendants' reckless, willful, and wanton conduct was the direct and proximate cause of the injuries and harm to Mr. Antulov and Ms. Clap's consequent loss of consortium.

206.    But for Defendants' grossly negligent acts or omissions, Mr. Antulov would not have been injured.

207.     Consequently, Plaintiffs are entitled to compensatory damages for medical expenses, pain and suffering, lost wages, loss of consortium, and emotional distress.

208.    Plaintiffs are also entitled to punitive damages for Defendants' utter disregard for their rights or safety.

## Count III: Battery

209.    The foregoing paragraphs are incorporated by reference.

210.    At all relevant times, Defendants knew or should have known that PFAS included in AFFF and other firefighting products, which they designed, engineered, manufactured, distributed, and sold, were biopersistent, highly toxic, carcinogenic, and otherwise harmful and injurious.

211.    At all relevant times, it was reasonably foreseeable that Mr. Antulov would be exposed to PFAS, resulting in him accumulating PFAS in his blood.

212.    Despite their knowledge, Defendants knowingly, purposefully, and intentionally continued to engage in acts or omissions, including but not limited to acts and omissions described in this Complaint, that resulted in Mr. Antulov being

exposed and continuing to be exposed to PFAS, which continued to accumulate in his blood.

213.    Plaintiff did not consent to the introduction of PFAS into his body; indeed, the Defendants' failure to inform him of the hazard meant he could not have consented.

214.    Introduction of PFAS into Mr. Antulov's body, and its persistence there, without his consent is a harmful and offensive physical invasion of Mr. Antulov's person that unreasonably interferes with his rightful use and possession of his body.

215.    Mr. Antulov finds this invasion harmful and offensive, as any reasonable person would.

216.    Defendants acted or failed to act intentionally, with knowledge that the invasion of PFAS into Mr. Antulov's body was substantially certain to result from their acts or omissions.

217.    Mr. Antulov's injuries resulted directly from Defendants' intentional, harmful contact with his body.

218.    Consequently, Plaintiffs are entitled to compensatory damages for medical expenses, pain and suffering, lost wages, loss of consortium, and emotional distress.

## **Count IV: Failure to Warn**

219.    The foregoing paragraphs are incorporate by reference.

220.   Defendants knew or should have known that (1) exposure to PFAS and products containing PFAS was hazardous to the environment and to human health; (b) the manner of their designing, manufacturing, marketing, distributing, and selling PFAS-containing products was hazardous to human health; and (c) the manner of their designing, manufacturing, marketing, distributing, and selling PFAS-containing products was likely to result in Mr. Antulov's exposure to PFAS and injuries.

221.   Because they knew of the hazardous and inherently dangerous properties of their PFAS-containing products, Defendants had a duty to warn purchasers, users, and others of the hazards associated with those products.

222.   Defendants provided insufficient warnings to purchasers, users, and others that the use of PFAS-containing products, including AFFF, would result in the accumulation of PFAS in the blood and a high risk of cancer or other illness.

223.   Adequate warnings and instructions could have reduced or eliminated foreseeable risks of injury because warnings or instructions would have allowed Mr. Antulov, his employers, and others to take measures to reduce or eliminate exposure.

224.   Defendants' failure to warn was, therefore, a proximate cause of Mr. Antulov's injuries.

225.   Consequently, Plaintiffs are entitled to compensatory damages for medical expenses, pain and suffering, lost wages, loss of consortium, and emotional distress.

## **Count V: Design Defect**

226.    The foregoing paragraphs are incorporated by reference.

227.    Defendants knew or should have known that exposure to PFAS is hazardous to human health; the manner in which their PFAS-containing products were designed, manufactured, marketed, distributed, and sold was hazardous to human health; and the manner in which their PFAS-containing products were designed, manufactured, marketed, distributed, and sold could and would release PFAS into the environment and into Plaintiff's body.

228.    Defendants could have designed, manufactured, marketed, distributed, and sold alternative designs or formulations of AFFF that did not contain toxic PFAS.

229.    Nontoxic alternative designs and formulations were available, practical, and technologically feasible, and these alternative designs would have reduced or prevented the reasonably foreseeable harm to Mr. Antulov caused by the Defendants' manufacture, marketing, distribution, and sale of AFFF and other products containing toxic, and poisonous PFAS.

230.    PFAS-containing products, including AFFF, were so dangerous to human health that the act of designing, formulating, manufacturing, marketing, distributing, and selling them was unreasonably dangerous under the circumstances.

231.    The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable alternative design that was not unreasonably dangerous, as the PFAS-containing products were.

232.    Defendants' defective design and formulation of PFAS-containing products, including AFFF, was a direct and proximate cause of Mr. Antulov's exposure to PFAS and his injuries.

233.    Consequently, Plaintiffs are entitled to compensatory damages for medical expenses, pain and suffering, lost wages, loss of consortium, and emotional distress.

### Count VI: Strict Liability (Statutory)

234.    The foregoing paragraphs are incorporated by reference.

235.    Plaintiffs assert any and all remedies available under statutory causes of action from Plaintiffs' state for strict liability against each Defendant.

236.    Defendants were engaged in the design, manufacture, marketing, sales, and distribution of AFFF, underlying chemicals, or other PFAS-containing products.

237.    AFFF was in a defective condition and unreasonably dangerous to users and consumers when designed, manufactured, marketed, sold, or distributed by Defendants and put to reasonable and ordinary use by end users.

238.    As a direct and proximate result of the defects of Defendants' products, Mr. Antulov has been seriously injured, sustaining severe and permanent pain and

suffering, disability, impairment, loss of enjoyment of life, and economic loss and damages.

239.    Defendants are strictly liable in tort to Mr. Antulov for their wrongful conduct.

240.    Consequently, Plaintiffs are entitled to compensatory damages for medical expenses, pain and suffering, lost wages, loss of consortium, and emotional distress.

## Count VII: Strict Liability (Restatement)

241.    The foregoing paragraphs are incorporated by reference.

242.    Mr. Antulov brings strict product liability claims under the common law, Section 402A of the Restatement of Torts (Second), or Restatement of Torts (Third).

243.    Defendants were engaged in the design, manufacture, marketing, sales, and distribution of AFFF, underlying chemicals, or other PFAS-containing products.

244.    AFFF was in a defective condition and unreasonably dangerous to users and consumers when designed, manufactured, marketed, sold, or distributed by Defendants and put to reasonable and ordinary use by end users.

245.    Defendants failed to properly and adequately warn and instruct Mr. Antulov as to precautions to assure safe use of the Defendants' products.

246.    Defendants failed to properly and adequately warn and instruct Mr. Antulov regarding the inadequate research and testing regarding the product.

247.    Defendants failed to avail themselves of reasonable alternative designs that would have made the product safer and would most likely have prevented the injuries and damages to Mr. Antulov.

248.    Thus, Defendants continued manufacture, marketing, distribution, and sale of PFAS containing products violated state law and the Restatement of Torts.

249.    Defendants' products are inherently dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses, and do not meet or perform to expectations.

250.    As a proximate result of Defendants' design, manufacture, marketing, and continuing sale and distribution of the products, Mr. Antulov has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and economic damages.

251.    Defendants are strictly liable for the injuries and damages suffered by Mr. Antulov that were caused by these defects in the AFFF product.

252.    Consequently, Plaintiffs are entitled to compensatory damages for medical expenses, pain and suffering, lost wages, loss of consortium, and emotional distress.

## Count VIII: Fraudulent Concealment

253.    The foregoing paragraphs are incorporated by reference.

254.    Throughout the relevant time period, Defendants knew that their products were dangerously defective and unreasonably unsafe for their intended purpose.

255.    Defendants had a duty to Mr. Antulov and the public to warn of the inherently dangerous nature of the products because they were in a superior position in terms of their knowledge and capability to know of the dangers presented by their products.

256.    Instead of warning Mr. Antulov and others of the inherent danger of their products, Defendants fraudulently concealed the information they had, including results of research studies they conducted or sponsored that showed that PFAS and products containing PFAS were inherently dangerous to human health.

257.    Defendants fraudulently and affirmatively concealed the defective nature of their products from Mr. Antulov and others.

258.    The facts concealed or not disclosed by Defendants were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase or use Defendants' products.

259.    Defendants intentionally concealed or failed to disclose the true defective nature of their products so that Mr. Antulov and others would use Defendants' products.

260.    Mr. Antulov justifiably acted or relied upon Defendants' knowledge regarding PFAS and their PFAS-containing products, to his detriment.

261.    Defendants, by concealment or other action, intentionally prevented Mr. Antulov from acquiring material information regarding the dangerousness of their products.

262.    Defendants are therefore liable for fraudulent concealment under all applicable laws, including, but not limited to, Restatement (Second) of Torts §550 (1977).

263.    As a proximate result of Defendants' conduct, Mr. Antulov has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and economic damages.

264.    Consequently, Plaintiffs are entitled to compensatory damages for medical expenses, pain and suffering, lost wages, loss of consortium, and emotional distress.

## Count IX: Breach of Express and Implied Warranties

265.    The foregoing paragraphs are incorporated by reference.

266.    At all times relevant to this action, Defendants manufactured, marketed, labeled, and sold PFAS-containing products, including AFFF, previously alleged and described in this Complaint.

267.    Defendants knew of the use for which their products were intended and impliedly or expressly warranted that the products were merchantable, safe, and fit for their intended purpose.

268.    Defendants breached their implied or express warranties because their products did not meet reasonable expectations for performance when used as

intended and was neither of merchantable quality nor safe for the intended use in that the products have a propensity to cause serious injury, including but not limited to cancer.

269.    Defendants' breach of their implied or express warranties proximately resulted in the injuries and damages suffered by Mr. Antulov

270.    Mr. Antulov is within the class of foreseeable users and reasonably relied upon Defendants' judgment and Defendants' implied or express warranties in using the products.

271.    Consequently, Plaintiffs are entitled to compensatory damages for medical expenses, pain and suffering, lost wages, loss of consortium, and emotional distress.

## Count X: Loss of Consortium

272.    The foregoing paragraphs are incorporated by reference.

273.    Plaintiff Julie Clap is married to Plaintiff Robert Anthony Antulov and was married to him at all times relevant to this action.

274.    As a direct and proximate result of Defendants' conduct, as alleged elsewhere in this Complaint, Ms. Clap has suffered and will continue to suffer both economic damages and noneconomic damages, in the form of loss of Mr. Antulov's care, comfort, support, companionship, services, society, love, and affection.

275.    Plaintiffs' marital relationship has been impaired and depreciated, and the marital association between them has been altered.

276.    Ms. Clap has suffered great emotional pain and mental anguish, and will continue to suffer emotional distress, economic loss, and other damages.

277.    Consequently, Plaintiff Julie Clap is entitled to compensatory damages for her emotional distress, economic loss, and other damages.

## Count XI: Punitive Damages

278.    The foregoing paragraphs are incorporated by reference.

279.    Defendants engaged in willful, wanton, malicious, and reckless conduct without regard to the consequences or safety of Mr. Antulov and others.

280.    Defendants' willful, wanton, malicious, and reckless conduct caused serious injuries upon Mr. Antulov, disregarding his protected rights.

281.    Defendants' willful, wanton, malicious, and reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure Mr. Antulov and others were not exposed to PFAS, which Defendants knew were linked to serious medical conditions, and their failure to disclose the inherently dangerous nature of their products when they learned of the danger.

282.    Defendants have caused significant harm to Mr. Antulov and have demonstrated a conscious and outrageous disregard for their safety with implied malice, warranting the imposition of punitive damages.

283.    Consequently, Plaintiffs are entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

1.    That this Court find Defendants liable, jointly and severally, on each of the claims and Causes of Action named in this Complaint.

2.    That this Court award Plaintiff Robert Anthony Antulov compensatory damages for past and future medical expenses, pain and suffering, and medical monitoring, together with interest and costs as provided by law.

3.    That this Court award Plaintiff Julie Clap compensatory damages for loss of consortium and associated losses.

4.    That this Court award Plaintiffs punitive damages for the wanton, willful, fraudulent, or reckless acts of the Defendants.

5.    That this Court award Plaintiffs costs and attorneys' fees as allowed by law.

6.    That this Court award such further relief as is necessary in the interest of justice.

## JURY DEMAND

Plaintiffs demand a trial by jury on all matters so triable.

This, the 13th day of January 2025.

MILLER LAW GROUP, PLLC

By: _/s/ W. Stacy Miller II_____
    W. Stacy Miller II
    N.C. Bar No. 21198
    MaryAnne M. Hamilton
    N.C. Bar No. 59323
    Post Office Box 6340
    Raleigh, NC 27628
    T: (919) 348-4361
    F: (919) 729-2953
    maryanne@millerlawgroupnc.com

WHITLEY LAW FIRM

By: _/s/ Dakota S. Lee_____
    Dakota S. Lee
    Colorado Bar No. 56506
    1000 Social Street, Suite 200
    Raleigh, NC 27609
    T: (919) 785-5000
    dsl@whitleylawfirm.com